James C. HUFFMAN (Plaintiff), Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation (Defendant), Appellant.

No. 44492.

Supreme Court of Missouri.

Division No. 1.

July 11, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 12, 1955.

864

Warner Fuller, Arnot L. Sheppard, St. Louis, for appellant.

Haley, Fredrickson & Caruthers, Rexford H. Caruthers, St. Louis, for respondent.

VAN OSDOL, Commissioner.

This is an appeal from a $20,000 judgment rendered in plaintiff's action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for personal injuries allegedly sustained by plaintiff when he slipped and fell in the oily, slick area north of No. 1 interchange track in the Roselake Yard of the Pennsylvania Railroad Company in Illinois. At the time of his injury, plaintiff, a member of a switch crew in the employ of defendant Terminal Railroad Association of St. Louis, was engaged in the movement and delivery or interchange of a "cut" or train of cars from defendant's Central District Yard in East St. Louis to the Pennsylvania's Roselake Yard. Plaintiff's claim is based on the alleged failure of defendant to exercise ordinary care to provide plaintiff with a reasonably safe place to work.

Herein defendant-appellant contends the trial court erred in submitting plaintiff's case to the jury; in instructing the jury; in the admission and exclusion of evidence; and in permitting improper cross-examination of a witness for defendant.

There was evidence introduced tending to show that in the Roselake Yard there are three east-west interchange tracks numbered 1, 2, and 3, from south to north. Three or four car lengths to the westward of the easterly end of interchange track No. 1 there is a small wooden boardwalk, sometimes called a bridge, consisting of wedge-shaped pieces of wood laid against the rails in such a way as to make a ramp for the easy passage (over the rails) of wheel-

barrows loaded with tools. It is usual for defendant's switch crews when moving trains or cuts of cars to the three interchange tracks to complete the interchange movement a short distance west of the small wooden bridge. There the switch engine is usually detached from the train, and the foreman of the switch crew walks eastwardly a few hundred feet to deliver his "bills" to the yardmaster, and to get instructions from a dispatcher as to the track the switch engine (and caboose) may pass over in returning to defendant's Central District Yard. The Pennsylvania's switchstand No. 8 is some ten or twelve feet to the southeastward of the small wooden bridge. When a cut of cars is set on an interchange track, the journal boxes of each car of the train are oiled by employees of the Pennsylvania. The oiling of journal boxes of cars on these interchange tracks west of switchstand No. 8 and the small wooden bridge has been going on for years, and drippings of oil have fallen on the ground along and between the interchange tracks west of the small wooden bridge so that the area has become oil-soaked and slippery. This is ·the general condition from and west of switchstand No. 8 and the small wooden bridge, and for several hundred feet to the westward. There was evidence tending to show that east of the small wooden bridge there is no oily or slippery condition. A witness said it is oily west of No. 8 switchstand and the small wooden bridge with "an inch to an inch and a half top surface of oil." By this we understand the witness meant the ground has become soaked with oil to an inch or an inch and half in depth. The ground is also "bumpy." There was evidence tending to show that this condition had obtained for several years prior to the time when plaintiff was injured.

Plaintiff testified that he, the head man of a switch crew, had assisted in the movement of a cut of cars over to the No. 1 (the south) interchange track. The train had been stopped with the engine two or three car lengths west of the small wooden bridge. The engine was then disengaged from the train; moved forward (eastwardly) four to six feet; was there brought to a stop; and the foreman had gone eastwardly to attend to his "bills," and for instructions relating to the further movement of the switch engine. It was nighttime—about eleven-thirty—and there was no artificial light at that place in the Roselake Yard. When the engine was stopped its headlight had been turned off in compliance with an operating rule. After the foreman had been gone fifteen or twenty minutes, plaintiff saw him returning and giving a signal to "come ahead." The foreman's signal was not observed by the engineer of the switch engine.

Plaintiff testified, "Well, the foreman kept giving signals, so I thought, well I better go back there and holler at him (the engineer), tell him to come on out of the track. * * * So, I was sitting on the pilot beam and I scooted off the pilot beam down with both feet on the footboard. * * I started to step off the engine and we have what is known as a grab iron, grab rail, to hold to. I lit my lantern—that is an electric lantern—and took my left hand to hold the grab rail and stepped down on the ground. As I started, as I stepped on the ground I made a turn (to the left) towards the back of the engine, and when I stepped the other foot down, why I stepped on something that was greasy, was slick. I started stumbling and falling backwards. I fell into something along right just at the side of the engine, the front side of the engine and I cut a place between my shoulders. When I wound up falling I was lying across the (north) rail in front of the engine, about halfway inside the track and half out." There was evidence introduced by plaintiff tending to show that he sustained serious injury.

Defendant developed evidence tending to show that, if plaintiff fell, his injuries were but trivial; and that, if plaintiff fell, it was at some point east of the small wooden bridge and switchstand No. 8, where the ground was not saturated with oil. Defendant also introduced evidence tending to show that plaintiff's condition of disability was not due to trauma or physical injury as a result of his falling, but that

plaintiff's condition was due to disease, syphilis, which had progressed to its third or tertiary degree—that is, tabes dorsalis, locomotor ataxia. Defendant also introduced evidence in impeachment. There was evidence that plaintiff had thrice been convicted of crime, one of which convictions was on a Federal charge. While serving this time, plaintiff was transferred (in 1937) to the United States Medical Center at Springfield; and the records of that institution disclose that plaintiff's condition was there diagnosed (in 1939) as "syphilis, tertiary, central nervous system."

As we have stated, plaintiff testified he stepped from the engine down "on the ground." At another place in his testimony he said he did not see what it was he stepped on and slipped; again he said he may or may not have stepped on a tie; and again he said he stepped on something higher than the ground, although he said he stepped on something slick. As will be noted infra, plaintiff, in his verdict-directing Instruction No. 1, hypothesized that plaintiff stepped "onto the ground," and that the ground "was oily, slick and not lighted." Defendant-appellant argues plaintiff's evidence forces the conclusion that plaintiff stepped down on a tie or some object other than the "ground" and there was no allegation or proof that any tie or other substance than the ground was oily and slick, so that the failure of plaintiff to definitely and unequivocally say he stepped and slipped on the "ground" as submitted was fatal, being a failure of proof of the fact as hypothesized in the instruction. But, as stated, plaintiff said he stepped on something slick; and we think the "ground" as submitted in the instruction should be reasonably considered as the area north of interchange track No. 1 where plaintiff stepped down, the "bumpy" slick surface of which area was comprised, it may be inferred, of ties extending from beneath the rails as well as cinders, gravel or earth. It seems that otherwise than above stated, defendant-appellant does not contend plaintiff failed to make out a case (as submitted) by his own testimony, if his testimony supporting his case was worthy of belief.

Having examined the evidence tending to support plaintiff's case as submitted, we are of the opinion there were substantial bases for the inferences that the area between interchange tracks Nos. 1 and 2 and west of the small wooden bridge and switch-stand No. 8 was oily, slick and not lighted, and not reasonably safe for employees to step and walk upon. This was a place, the evidence shows, where employees usually completed interchange switching movements with necessarily incidental use of the area for stepping and walking upon in uncoupling, and moving switch engines from trains. The oily, slick condition had existed for years so that defendant, in the exercise of ordinary care, could have remedied the unsafe condition. And we believe we cannot say as a matter of law that the fact that the area was not lighted did not have its substantial part in rendering the place unsafe and in proximately causing plaintiff's fall and injury. The testimony of but a single witness, plaintiff, was substantial evidence tending to show that he, in attempting to relay or communicate the foreman's signal to the engineer stepped down on something slick in the unlighted area and was caused to slip and fall and was injured.

█ Defendant-appellant has devoted several pages of its brief in an endeavor to demonstrate that plaintiff's testimony was so manifestly false, so "entirely beyond reason" and unbelievable that it was wholly insufficient in probative value to make out a prima facie case. It is pointed out that plaintiff had made varying and inconsistent statements about his age and marriages; had denied that he had been convicted of crime; had misrepresented the times and places when and where he had worked; had denied or equivocated as to the facts of several former claims for personal injury; and had not theretofore recounted the manner of his instant injury as he did on the witness stand. Defendant-appellant also reminds us that plaintiff's testimony of the circumstances of his injury was not corroborated, and moreover, that testimony of witnesses for defendant tended to refute or destroy the substance of plaintiff's testi-

mony. The tenor of the testimony of defendant's witnesses was that they did not see plaintiff fall and that plaintiff had made statements to them relating to the circumstances of his injury inconsistent with the facts as stated by him on the witness stand. Now plaintiff's testimony at the trial of this cause as disclosed by the record was not contradictory or self-destructive. The testimony of these prior inconsistent and equivocal statements of plaintiff and other impeaching evidence were of interest to the jury in determining what credence should be given to plaintiff's testimony in the trial of the case. We do not say that impeaching evidence was not so sufficiently developed that the jury would not have been justified in disbelieving plaintiff; but we must say it is settled in our practice that it is the province of the jury as the triers of the facts to weigh the evidence and pass upon the credibility of the witnesses and the value of their testimony. Caswell v. St. Louis Public Service Co., Mo.Sup., 262 S. W.2d 40; Higgins v. Terminal R. R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380; Reeves v. Thompson, 357 Mo. 847, 211 S. W.2d 23; Young v. Wheelock, 333 Mo. 992, 64 S.W.2d 950; Henwood v. Coburn, 8 Cir., 165 F.2d 418.

Plaintiff's case was submitted to the jury by his principal verdict-directing Instruction No. 1, which was as follows,

"The Court instructs the jury that this case is brought and being tried under the Federal Employers' Liability Act, * * * and that under such law it was the duty of the Defendant * * * to exercise ordinary care to discover dangers in places where its employees were required to work and to furnish its employees with a reasonably safe place in which to work * * *.

"Therefore, you are further instructed that, if you find and believe from the evidence * * * the Plaintiff, James C. Huffman, while engaged in the performance of his duties as an employee of Defendant * * * was a member of a crew delivering railroad cars * * * on interchange track No. 1 in the Roselake Yard of the Pennsylvania Railroad Company, mentioned in evidence; and that it became necessary for Plaintiff to, and that he did, step from one of Defendant's locomotives, which was being used to move said railroad cars, onto the ground between said interchange track and * * * interchange track No. 2 in said yard and that the ground between said interchange tracks was oily, slick and not lighted, and that the Defendant * * * knew, or by the exercise of ordinary care, should have known that the ground between said tracks was in such condition and that it had been and was reasonably certain to be used by persons getting on and off railroad cars and locomotives in doing the work of delivering railroad cars * * * and that by reason of such oily, slick and unlighted condition between said tracks (if you find that it was in such condition), the Defendant * * * did not exercise ordinary care to furnish Plaintiff with a reasonably safe place to work, then you are instructed that the Defendant * * * was negligent, and if you further find and believe from the evidence that wholly or partly as a result of such negligence Plaintiff, James C. Huffman, slipped and fell, and as a direct result thereof, sustained bodily injury, then your verdict should be in favor of Plaintiff, James C. Huffman, and against" defendant.

■ Contrary to defendant-appellant's contention, we are of the opinion that the first paragraph of Instruction No. 1 did not impose an unqualified duty upon defendant to furnish plaintiff with a reasonably safe place in which to work. It is true the employer is not the insurer of his employees' safety, and it would seem that the employer has fulfilled his duty to his employee if the place of work furnished is reasonably safe, or if the employer has exercised ordinary or reasonable care to make it safe. Strictly speaking the test is not whether the place in which the work

is to be performed is absolutely safe, but whether the employer has exercised reasonable care to make it safe. Reese v. Illinois Terminal R. R. Co., Mo.Sup., 273 S.W.2d 217, and authorities cited therein. Here in the first paragraph of Instruction No. 1 the duty of the employer-defendant is abstractly stated as being the duty "to exercise ordinary care to discover dangers in places where its employees were required to work *and* to furnish its employees with a reasonably safe place in which to work * * *." (Our italics.) In our opinion the phrase "to exercise ordinary care" would be understood by a jury as applicable not only to the phrase "to discover dangers" but also the phrase "to furnish its employees with a reasonably safe place in which to work." It has been further noted that this Instruction No. 1 did not specifically and expressly submit to the jury that the oily, slick condition of the ground was dangerous or not reasonably safe. This is said by defendant-appellant to render the instruction prejudicially erroneous, there being, it is asserted, a failure to hypothesize or submit an element or ingredient essential to a recovery. See Reese v. Illinois Terminal R. R. Co., supra; and Wagner v. Missouri-Kansas-Texas Railroad Co., Mo. Sup., 275 S.W.2d 262. The Instruction No. 1 was not like the erroneous instructions in the Reese and Wagner cases. Although the Instruction No. 1 did not precisely and definitely require a finding that the oily, slick, unlighted condition was dangerous or not reasonably safe, yet inferentially the jury was required to so find, inasmuch as the instruction required the finding "that by reason of such oily, slick, and unlighted condition * * * the Defendant * * * did not exercise ordinary care to furnish Plaintiff with a reasonably safe place to work * * *"; and we further notice that Instruction No. 4, given at defendant's instance, made definite and clarified the requirement that the jury should find the hypothesized condition was not reasonably safe. In Instruction No. 4 the jury was advised that no verdict could be rendered for plaintiff unless it was found from the greater weight of the evidence that "at such points west of said walkway

the ground was so slick, greasy and oily that it was not reasonably safe. * * *." Now the jury was also instructed by Instruction No. 6, given at defendant's request, that the evidence "does not establish that there was any oil, grease" east of the wooden bridge, and that if the jury found the switch engine was stopped "at a point east of said wood crosswalk * * *, your verdict must be in favor of defendant." We bear in mind that instructions should be read together and in combination, and we are of the opinion that Instruction No. 1, considered together with the other given instructions was not prejudicially erroneous or misleading. We are of the further opinion the language, "wholly or partly as a result of such negligence" plaintiff slipped and fell, "and as a direct result thereof, sustained bodily injury," was not a prejudicially erroneous submission of the essential element of actionable negligence-causation. The language "wholly or partly" is in apparent reference to the language "resulting in whole or in part from the negligence" as used in Section 51 of the Act. 45 U.S.C.A. § 51.

■ The jury was told by plaintiff's Instruction No. 3 that defendant did not contend that any act or failure to act on the part of plaintiff contributed in causing his injury and that although the jury might believe from the evidence that some act or failure to act on the part of plaintiff did contribute to his injury, the jury was not to consider such fact in connection with the issues of negligence of defendant and of damage to plaintiff. Defendant-appellant contends the instruction brought contributory negligence into the case, although plaintiff's negligence was not pleaded. It is said the instruction accentuated plaintiff's claim of defendant's negligence, and confused the issues. The instruction was cautionary in nature to be given or refused in the sound discretion of the trial court. In the state of the pleadings wherein no issue of diminution of damages because of contributory negligence of plaintiff, 45 U.S. C.A. § 53, was raised by defendant in this Federal Employers' Liability Act case, it is difficult to see how the instruction could

have been prejudicial. And we do not believe the instruction could be correctly said to have confused the issues in this case wherein no humanitarian rule negligence was involved. Holmes v. Terminal R. R. Ass'n of St. Louis, 363 Mo. 1178, 257 S.W.2d 922, and cases cited; Higgins v. Terminal R. R. Ass'n of St. Louis, supra.

■ The trial court refused to give defendant's proffered Instruction C which was as follows,

"You are instructed that if you believe from the evidence in this case that plaintiff is and was at the time he claims he was hurt on July 17, 1952, suffering from syphilis and resulting tabes dorsalis; and if you further believe from the evidence that his present physical condition is the direct result of syphilis, if you find he is suffering from that disease, then he cannot recover in this case, and your verdict should be for the defendant railroad company."

The instruction submits that plaintiff is and was suffering from syphilis and resulting tabes dorsalis and that his present physical condition is the direct result of syphilis. But the instruction does not negative that plaintiff sustained injury as the direct result of falling as submitted, and the instruction directs a verdict for defendant. Now a jury might have believed that plaintiff's present physical condition is due to syphilis. Even so, this would not authorize a verdict for defendant if plaintiff sustained injury as a direct result of having fallen in the circumstances as alleged, supported by substantial evidence, and submitted. We rule the trial court did not err in refusing the Instruction C.

Attending now contentions of error in the admission and exclusion of evidence, and in the cross-examination of a witness for defendant—

■ Plaintiff's witnesses, physicians, were asked hypothetical questions and requested to give their opinions relating to the cause of plaintiff's physical condition and disability. It is the position of defendant-appellant that the trial court erred in admitting this opinion evidence because, it is said the hypothetical questions propounded did not require the witness to assume the truth of the facts shown in hospital records which plaintiff had introduced, and which records disclosed, inter alia, the diagnosis that plaintiff had suffered from tabes dorsalis. A careful reading of the record discloses that defendant's counsel may not have made specific and timely objections so as to raise and preserve his present contention of error with respect to the admission of this opinion evidence. However, it is not absolutely essential that a hypothetical question should include all material facts supported by evidence. The questioner may frame his hypothetical question on his own theory and may not necessarily include all of the material facts shown in evidence. The questioner may elicit an opinion on any combination or set of facts he may choose, if the question propounded fairly hypothesizes facts the evidence tends to prove and fairly presents the questioner's theory so that the answer will be of assistance to the jury on the issue. State v. Sapp, 356 Mo. 705, 203 S.W.2d 425; Golden v. National Utilities Co., 356 Mo. 84, 201 S.W.2d 292; Smith v. General Motors Corp., Mo.Sup., 189 S.W.2d 259. It has been written that for reasons of principle and to some extent of policy, the natural conclusion would be that the questioner need not cover in his hypotheses the entire body of testimony put forward on that point by him or his opponent. Vol. II, Wigmore on Evidence, 3d Ed., § 682, at page 807. In our case the examiner, plaintiff's counsel, suggested and the trial court permitted the expert witnesses to read the hospital records, and the witnesses were asked to assume their "validity" and that they "contain the information as shown by the records" in connection with other facts stated in the hypothetical questions and supported by the evidence. The hypotheses contained in questions were not unfair or valueless in supporting an opinion as in the case of De Donato v. Wells, 328 Mo. 448, 41 S.W.2d 184, 82 A.L.R. 1331, cited by defendant-

appellant, wherein the expert witnesses were required to eliminate all other causes of plaintiff's miscarriage so as to compel an opinion that the miscarriage was caused by the trauma as claimed by the examiner.

▮▮▮▮ Complaint is also made that a witness for plaintiff, an examining physician, was permitted to base his opinion as an expert as to the cause of plaintiff's physical condition upon statements of plaintiff to the witness with respect to plaintiff's past experiences of pain. The doctor had testified that plaintiff complained to him of pain in the left shoulder and over the left shoulder blade, also of some stiffness in the left shoulder; "that if he (plaintiff) turned his head to the side he had some aggravation of pain in the shoulder. Secondly he complained of constant weakening pain in the lower part of his back, at times acute. * * * that at times the pain in his back was made worse, was aggravated, and that this was done by, he thought, by turning or twisting his body or stooping, and when he had acute pain in his back the pain went into the posterior aspect of his left side. When these attacks occur he has weakness of the lower extremity." A physician, in stating his expert opinion on a patient's condition, may testify to what the patient said (an exception to the hearsay rule) concerning his present, existing symptons and complaints. However, he may not base his opinion upon or testify to statements of the patient with respect to past physical conditions, circumstances surrounding the injury, or the manner in which the injury was received. Holmes v. Terminal R. R. Ass'n of St. Louis, supra, 363 Mo. 1178, 257 S.W.2d 922. If it be assumed the facts which the doctor testified plaintiff had stated as to his physical condition in some instances referred to plaintiff's experiences in the past, nevertheless, the plaintiff had testified during the trial that he had experienced the pains substantially of the nature detailed by the doctor as the bases in part of his opinion; that is, the "history" of pain which the doctor stated as having been related by plaintiff to him was otherwise in evidence. Therefore, it would seem the objection that "history" of previous conditions of pain was prejudicially permitted as the basis in part of the physician's opinion must fall. Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780; Holloway v. Kansas City, 184 Mo. 19, 82 S.W. 89; Baumhoer v. McLaughlin, Mo.App., 205 S.W.2d 274.

▮▮▮▮ It was not an abuse of discretion for the trial court to permit cross-examination of defendant's witness, a physician, on matters tending to show his bias in favor of a defendant. Wild v. Pitcairn, 347 Mo. 915, 149 S.W.2d 800. Nor was it error to exclude evidence of, or limit the cross-examination of plaintiff concerning the collateral facts of plaintiff's marriages and decrees of divorce and the grounds on which the decrees were granted. Bush v. Kansas City Public Service Co., 350 Mo. 876, 169 S.W.2d 331. Some excerpts of a deposition, offered as plaintiff's admissions or in impeachment, were excluded. The exclusion of this evidence could not have been prejudicial. Plaintiff in substance admitted during his testimony as a witness the statements which the excerpts of the deposition would have tended to prove.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.